Justin OCOMEN and Judy C. Ocomen, Individually and as next Friends of Crystal Ocomen and Monica Ocomen, Appellants,

v.

Pedro A. RUBIO, M.D., Appellee.

No. 01–99–00306–CV.

Court of Appeals of Texas, Houston (1st Dist.).

June 8, 2000.

John O. Tyler, Jr., Mickey N. Das, Houston, for appellant.

Matthew T. McCracken, John C. Marshall, James C. Marrow, Houston, for appellee.

Panel consists of Justices MIRABAL, TAFT, and PRICE.*

## OPINION

MIRABAL, Justice.

This is a medical malpractice case involving claims of negligence, gross negligence, and failure to inform a patient of the risks and hazards of resection surgery. After a jury found in favor of defendant on

---

* The Honorable Frank C. Price, former Justice, Court of Appeals, First District of Texas at Houston, participating by assignment.

all claims, the trial court entered a judgment that plaintiffs take-nothing. We affirm.

## FACTS

On March 20, 1994, at approximately 7:00 a.m., Judy C. Ocomen, plaintiff and appellant, went to the HCA Medical Center Hospital emergency room complaining of severe abdominal pain. Pedro Rubio, M.D., a general surgeon, was consulted by the emergency room physician, and he examined Ms. Ocomen around 10:00 a.m. Dr. Rubio is the defendant and appellee. Various tests were conducted, including an electrocardiogram, chest and abdominal x-rays, and a barium enema. Ms. Ocomen was also examined by a gynecologist, Lee White, M.D. A pelvic ultrasound revealed a large amount of pelvic fluid with an unknown etiology, but resulting from an inflammatory process in the pelvis.

Dr. Rubio's pre-operative diagnosis was that Ms. Ocomen had an "acute abdomen." She then signed a consent form which authorized Dr. Rubio and Dr. White to perform "exploratory surgery," laparoscopy and possible laparotomy.[1] After Dr. White found inflammatory disease of the small bowel during the laparoscopy, Dr. Rubio performed a laparotomy and resection of Ms. Ocomen's bowel by removing 85 centimeters. The post-operative diagnosis of Dr. Rubio was Crohn's disease of the ileum, a portion of the bowel.[2] Most recently, Ms. Ocomen was diagnosed with intestinal tuberculosis after she continued to experience abnormal symptoms.

Plaintiffs sued Dr. Rubio alleging that he was negligent and grossly negligent in diagnosing Ms. Ocomen with Crohn's disease and for surgically resecting her bowel.[3] Plaintiffs also allege that Dr. Rubio did not inform Ms. Ocomen of the risks and hazards associated with resection surgery.

The petition alleged in part:

### A. Negligence/Gross Negligence

Plaintiffs would show that a physician-patient relationship existed between Judy Ocomen and Defendant Pedro A. Rubio, M.D. The care and treatment (and/or lack of care and treatment) which Judy Ocomen received from Dr. Rubio was performed in a negligent and grossly-negligent manner, including, but not limited to, Dr. Rubio's failure to properly evaluate and diagnose Plaintiff Judy Ocomen's condition; failure to obtain appropriate consults; failure to try a course of medical treatment prior to surgery; and inappropriately removing approximately 85 centimeters of her distal ileum, her cecum, and her ileocecal valve. Such negligence and gross negligence was and remains a proximate cause of Plaintiffs' damages.

### B. Failure to Provide Adequate Treatment and Failure to Monitor

Dr. Rubio's diagnosis of Crohn's disease was incorrect, negligent, and grossly negligent. Dr. Rubio failed to adequately monitor and assess Plaintiff Judy Ocomen's problem prior to rushing into a surgical procedure. Furthermore, based on his assessment, he failed to prescribe and/or administer appropriate medications in lieu of performing a surgical procedure and failed to use a course of medical management before performing a radical surgical procedure. Dr.

---

1. A laparoscopy is an examination of the contents of the peritoneum, a part of the abdomen, with a laparoscope passed through the abdominal wall. STEDMAN'S MED. DICTIONARY 936 (26th ed.1995). A laparotomy is an incision into the abdomen. *Id.*

2. Crohn's disease is defined as an inflammation of the intestine. STEDMAN'S MED.DICTIONARY 575 (26th ed.1995).

3. Plaintiffs include Justin Ocomen and Judy C. Ocomen, individually and as next friends of Crystal Ocomen and Monica Ocomen.

Rubio also failed to use and improperly used medical devices and/or medical equipment in rendering care to Judy Ocomen.

## DISCUSSION

In seven issues, appellants contend: (1) the trial court abused its discretion by allowing testimony from appellee's surgical expert because he is not qualified; (2) the evidence is legally and factually insufficient to support the jury's finding of no negligence; and (3) the evidence is legally and factually insufficient to support the jury's finding that appellee did not fail to inform Ms. Ocomen of the risks and hazards of resection surgery.

### I.  Experts

In their sixth issue, appellants contend the trial court erred in denying their motion to disqualify appellee's surgical expert witness, Patrick Reardon, M.D. Appellants allege Dr. Reardon is not a qualified expert because: (1) he is not an expert on Crohn's disease; (2) his opinion is based upon the fact that Ms. Ocomen's bowel was perforated; and (3) his opinions are not supported by medical literature.

■ In response, appellee asserts that appellants' objection to Dr. Reardon was waived because it was untimely under section 14.01(e) of the Medical Liability and Insurance Improvement Act of Texas. *See* TEX.REV.CIV.STAT.ANN. art. 4590i, § 14.01(e) (Vernon Supp.2000).  We agree.

An objection to the qualifications of an expert witness in a medical malpractice case must be made no later than 21 days after the date the objecting party receives a copy of the witness's curriculum vitae or the date of the witness's deposition.  TEX. REV .CIV.STAT.ANN. art. 4590i, § 14.01(e) (Vernon Supp.2000).  A party is permitted to object after the expiration of this 21-

day period only when the basis for the objection arises after the expiration date, and the basis of the objection could not have been reasonably anticipated.  *Id.*

In the present case, Dr. Reardon's deposition was taken on January 8, 1998.  To be timely, appellants' objection must have been made some time before January 29, 1998;  however, appellants did not make their objection to Dr. Reardon's qualifications until during trial in November 1998. Moreover, the basis for appellants' motion to disqualify Dr. Reardon was the information given by Dr. Reardon in his deposition, not information that came to light some time after January 29, 1998.

Because appellants failed to object to appellee's expert in a timely manner, and because the objection was not based on information discovered after January 29, 1998, appellants failed to preserve error. *See* TEX.REV.CIV.STAT.ANN. art. 4590i, § 14.01(e) (Vernon Supp.2000).  We overrule appellants' issue six.

■ In issue three, appellants contend Dr. Reardon's testimony constitutes "no evidence" because it is based on an assumed fact that is contrary to the undisputed actual facts.  *See Burroughs Wellcome v. Crye,* 907 S.W.2d 497, 499–500 (Tex.1995).  Appellants argue that since the abdominal x-ray, the barium enema, the discharge summary and operative report signed by Dr. Rubio, and the pathology report of the removed bowel, indicate Ms. Ocomen's bowel was not perforated, it is an undisputed fact that Ms. Ocomen's bowel was not perforated.  As a result, appellants contend the trial judge should not have allowed Dr. Reardon to testify that it is possible that Ms. Ocomen's bowel was perforated, thereby justifying Dr. Rubio's removal of her bowel.

Appellants contention misses the mark.[4] As appellee correctly points out, whether

---

4.  In their brief, appellants contend this case is analogous to *Burroughs Wellcome v. Crye,* a case in which the plaintiffs alleged an antibiotic spray caused frostbite.  907 S.W.2d 497,

499 (Tex.1995).  The expert's opinion was based on the following assumptions: (1) there was no redness on the plaintiff's foot after the spray was applied, and (2) the spray was not

Ms. Ocomen's bowel was *actually* perforated is irrelevant. The relevant inquiry is whether exploratory surgery and resection is proper for a *suspected* perforation.[5]

Appellants' own experts agree that a perforation in the bowel justifies resection. Moreover, as Dr. Reardon testified, even though no perforation was detected from the tests conducted prior to surgery or by Dr. Rubio during surgery, that does not rule out the possibility that the bowel could have been perforated. On direct examination, Dr. Reardon testified with regard to Dr. Rubio's observation of pus covering a section of Ms. Ocomen's bowel:

> Q. Now, I want to talk about some of the reasons that would properly lie behind Dr. Rubio's decision to explore the exploratory laparotomy. From your review of the records, do you recall in Dr. White's laparoscopy report his report of having seen some purulent exudate?
>
> A. He described a section of bowel that was—I think the words he used were fibrilla purulence. That's a medical word for pus. It means pus.
>
> Q. Okay. And what can be the medical significance of pus being found on the exploratory of the small intestine?
>
> A. In general, intact small intestine ought not to have pus on the surface. And pus on the surface combined with inflamed-looking

small bowel poses the risk that the bowel has a perforation in it and that the contents of the bowel have come in contact with the contents that line the abdomen which are not meant to be in contact with the bowel and it's led to an intense reaction which causes the patient a great deal of pain. And pus forms as part of the body's response to try to take care of the problem.

Dr. Reardon went on to testify that the presence of pus, coupled with Ms. Ocomen's other symptoms, implied there was an inflammatory process that *could* mean there was a perforation. Further, he stated there is no way to be certain that a perforation did not exist, and even a small perforation in the bowel is a very serious condition which justifies removal of the diseased tissue.

Accordingly, the trial judge did not err by allowing Dr. Reardon to give testimony based on the possibility of perforation. Appellants' issue three is overruled.

## II. Sufficiency of the Evidence

In four issues, appellants assert the evidence is legally and factually insufficient to support the verdict of the jury. Specifically, in issues one and two, appellants contend the undisputed testimony of appellee's own gastroenterology expert conclusively establishes every element of appellants' negligence claim, and that the jury's finding of "no negligence" is against

---

applied as directed by product labeling. *Id.* These assumptions were contrary to undisputed testimony that the plaintiff's foot was red after the spray was applied and that the spray was applied correctly. *Id.* As a result, the expert's testimony was found to be "no evidence" because his opinion was based on assumptions that were contrary to the undisputed facts. *Id.* at 499–500.

**5.** In his brief, appellee draws a powerful analogy illustrating the error in appellants' argument:

A female patient presents to her physician with a lump in her breast. After tests are

inconclusive, the physician orders a biopsy. Upon examination of the biopsied tissue, it is determined that the lump is benign. The patient then claims that, because there was no malignancy, the biopsy was therefore unnecessary, and sues the physician. An expert, on behalf of the defendant physician, testifies that, based on the *risk* of life-threatening cancer, a biopsy was indicated. The plaintiff then attempts to have the expert's testimony declared "no evidence" because his opinion was based on an *assumption* of the presence of malignancy.

the great weight and preponderance of the evidence. In issues four and five, appellants argue that the undisputed testimony of appellee, Dr. Rubio, conclusively establishes every element of their claim that he failed to disclose the risks and hazards of resection surgery, and that the jury's finding that appellee did not fail to disclose these risks and hazards is against the great weight and preponderance of the evidence.

## A. Standard of Review

■ When, as here, the party with the burden of proof challenges the legal sufficiency of the evidence, we employ a two-prong test. We first examine the record for evidence that supports the finding or implied finding that is adverse to the appellant, while ignoring all evidence to the contrary. *Sterner v. Marathon Oil Co.*, 767 S.W.2d 686, 690 (Tex.1989); *Lee–Wright, Inc. v. Hall*, 840 S.W.2d 572, 579 (Tex.App.—Houston [1st Dist.] 1992, no writ). If there is no evidence to support the finding, then we examine the entire record to determine if the contrary proposition is established as a matter of law. *Id.* If the contrary proposition is established conclusively by the evidence, the issue will be sustained. *Id.*

■ In reviewing a factual sufficiency challenge, we assess all of the evidence and reverse for a new trial only if the implied finding is so against the great weight and preponderance of the evidence as to be clearly wrong and unjust. *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986); *Bond v. Kagan–Edelman Enters.*, 985 S.W.2d 253, 256 (Tex.App.—Houston [1st Dist.] 1999), *rev'd in part per curiam*, 20 S.W.3d 706 (Tex.2000)..

## B. Negligence

■ In a professional malpractice case, the plaintiff must prove: (1) a duty by the professional to act according to a standard; (2) a breach of the applicable standard of care; (3) an injury; and (4) a causal connection between the breach of care and the injury. *Bradford v. Alexander*, 886 S.W.2d 394, 396 (Tex.App.—Houston [1st Dist.] 1994, no writ). In a medical malpractice case, breach of the standard of care and proximate cause must be established through expert testimony. *Onwuteaka v. Gill*, 908 S.W.2d 276, 281 (Tex.App.—Houston [1st Dist.] 1995, no writ).

The jury charge on the issue of negligence states:

> Did the negligence, if any, of Pedro A. Rubio proximately cause the occurrence in question?
>
> **"Negligence,"** with reference to the conduct of Pedro A. Rubio, means the failure to use ordinary care; that is, failing to do that which a general surgeon of ordinary prudence would have done under the same or similar circumstances or doing that which a general surgeon of ordinary prudence would not have done under the same or similar circumstances.
>
> **"Ordinary Care,"** with reference to the conduct of Pedro A. Rubio, means that degree of care which a general surgeon of ordinary prudence possessing and exercising a reasonable degree of skill and learning would use under the same or similar circumstances.
>
> **"Proximate Cause,"** with reference to the conduct of Pedro A. Rubio, means that cause, which in a natural and continuous sequence, produces an event, and without which cause such event would not have occurred. In order to be a proximate cause, the act or omission complained of must be such that a general surgeon using ordinary care would have foreseen that the event, or some similar event, might reasonably result therefrom. There may be more than one proximate cause of an event.
>
> Answer "Yes" or "No"        <u>NO</u>

(Bold in original.)

### Legal Sufficiency

In issue one, appellants contend the testimony of Frank Lanza, M.D., appellee's

own gastroenterology expert, conclusively establishes each element of appellants' negligence claim. However, when Dr. Lanza was asked if he saw any way that Dr. Rubio failed to use ordinary care with regard to Ms. Ocomen's treatment, Dr. Lanza responded, "No, I don't." As a result, Dr. Lanza's testimony did not conclusively establish each element of appellants' claim. We overrule appellants' issue one.

### Factual Sufficiency

■ In issue two, appellants assert the jury's finding of no negligence was against the great weight and preponderance of the evidence. Appellants presented the testimony of several medical experts, including B. Lee White, M.D., Krishnamurthy Shivshanker, M.D., Norman B. Frankel, M.D., and Elizabeth Bonefas, M.D. Dr. Shivshanker and Dr. Frankel, who are both gastroenterologists, testified that the standard of care for Crohn's disease is medical management, not surgery, unless a complication exists. A complication would include perforation, obstruction, fistulas, strictures, or other intractable disease. Dr. Frankel testified that "to a medical certainty" Ms. Ocomen did not have a perforated bowel.

Dr. Bonefas, a general surgeon, testified that once Dr. Rubio made the diagnosis of Crohn's disease, he should not have performed a resection of Ms. Ocomen's bowel because she did not have any of the complications that would justify such a procedure. As a result, she concluded Dr. Rubio breached the standard of care for a general surgeon in the same or similar circumstances.

In response, appellee offered the testimony of himself and Patrick Reardon, M.D., both general surgeons, and Frank Lanza, M.D., a gastroenterologist. Dr. Reardon testified that for a surgeon faced with a patient who has an acute abdomen, such a Ms. Ocomen, the course of action should be exploration of the abdomen. Dr. Reardon testified in response to a question on the propriety of Dr. Rubio's care, "Af-ter reading the information, I believe that what Dr. Rubio did is what a well trained and reasonable and prudent surgeon would do and it's what I myself would have done were I in the same situation." Dr. Reardon stated that even though Dr. Rubio did not see a perforation, at that very moment, there was no way to know for sure whether there was a perforation. Moreover, leaving a possibly diseased bowel in a patient poses a significant risk to the patient's life, and as a result, the safest course is removal.

As discussed with regard to the legal sufficiency of the evidence, Dr. Lanza testified that, in his opinion, Dr. Rubio did not breach the standard of care. He also stated that surgical resection of the bowel in a patient with Crohn's disease can be within the standard of care.

Dr. Rubio testified as follows:

Q. Let's talk about the Crohn's disease diagnosis, because you've been asked about it over, and over and over. And, yes it appears on a lot of different pieces of paper in the chart, doesn't it?

A. Yes.

Q. Why?

A. Well, when a surgeon operates on a patient and does a procedure and removes tissue at least we were taught to try to identify a diagnosis after the surgery. That's also a presumptive diagnosis of something that we say this is probably what it is. This is one of the possibilities, because when you remove tissue the definite diagnosis comes from the pathologist. I guess we could put swollen valve as a diagnosis, but that doesn't sound too academic.

Q. Do doctors always know for certain what the cause of something is?

A. No.

Q. Do you have to work with a usable, workable, likely diagnosis?

A. Yes.

Q. Is that what this constant reference to Crohn's disease as a diagnosis is throughout the records?

A. Yes.

Q. Are you ever representing they're guaranteed you can take it to the bank this is Crohn's disease? No question about it?

A. No.

■ The jury is the sole judge of the credibility of witnesses and the weight to be accorded to their testimony. *State Indus., Inc. v. Corbitt*, 925 S.W.2d 304, 310 (Tex.App.—Houston [1st Dist.1996], no writ). We cannot say the jury's finding of no negligence is against the great weight and preponderance of the evidence. Accordingly, we overrule appellants' issue two.

## C. Failure to Obtain Informed Consent

In issues four and five, appellants contend there is "no evidence" or in the alternative, insufficient evidence, to support the jury's finding that appellee did not fail to disclose the risks and hazards inherent in resection surgery. Appellants assert that Ms. Ocomen was never informed of the risk of chronic diarrhea.

■ The issue of informed consent is governed by the Medical Liability and Insurance Improvement Act. Tex.Rev.Civ. Stat.Ann. art. 4590i, §§ 6.01–.07 (Vernon Supp.2000). Section 6.03 of the Act created the Texas Medical Disclosure Panel. *Id.* at § 6.03. The panel's responsibility is to evaluate all medical and surgical procedures, determine whether disclosure of risks is required, and if so, how much disclosure is required. *Id.* at § 6.04(a); *Peterson v. Shields*, 652 S.W.2d 929, 931 (Tex.1983). Once evaluated, each procedure is then placed on either List A or List B. List A procedures require some disclosure of the risks involved in the treatment; List B procedures require no

such disclosure. *Id.* at § 6.04. Proper disclosure of risks in medical procedures found on List A, or nondisclosure for medical procedures on List B, creates a rebuttable presumption the physician was not negligent. *Id.* at § 6.07; *Peterson*, 652 S.W.2d at 931. If a procedure is not on either list, the doctor is under the duty otherwise imposed by law. *Id.* at § 6.07(b). That duty is to disclose all risks and hazards that could influence a reasonable person in making his or her decision to consent to the procedure. *Peterson*, 652 S.W.2d at 931.

■ Bowel resection surgery appears on List B. *See* Tex.Admin.Code § 601.3(c)(9) (1999). As a result, there is no disclosure requirement and it gives rise to a rebuttable presumption that Dr. Rubio was not negligent in failing to inform Ms. Ocomen of the risks and hazards associated with resection surgery. *See Peterson*, 652 S.W.2d at 931.

■ The question of informed consent is whether a *reasonable person* could have been influenced in making a decision whether to give or withhold consent to the procedure had he or she known of the risk. *Barclay v. Campbell*, 704 S.W.2d 8, 10 (Tex.1986). If a *reasonable person* could have been influenced, then Ms. Ocomen was also entitled to be warned of the risks and hazards.

■ Over appellee's objection, the jury question on the issue of informed consent stated:

Did Pedro A. Rubio fail to disclose to Judy C. Ocomen such risks and hazards inherent in the resection (of the ileocecal valve, of the cecum, and/or of the terminal ileum) that he performed that could have influenced a reasonable person in making a decision to give or withhold consent to such treatment?

Answer "Yes" or "No" No

Prior to surgery, appellant, Ms. Ocomen, signed a written consent form. In pertinent part, the consent form states:

> I(we) understand that the following surgical, medical, and/or diagnostic procedures are planned for me and I(we) voluntarily consent and authorize these procedures: *laparoscopy, possible laparotomy.*
>
> I(we) understand that my physician may discover other or different conditions which require additional or different procedures than those planned. I(we) authorize my physician, and such associates, technical assistants and other health care providers to perform such other procedures which are advisable in their professional judgment.
>
> I(we) have been given an opportunity to ask questions about my condition, alternative forms of anesthesia and treatment, risk of nontreatment, the procedures to be used, and the risks and hazards involved, and I(we) believe that I(we) have sufficient information to give this informed consent.

Dr. Rubio testified that he explained to Ms. Ocomen prior to her surgery that he was going to do "exploratory surgery." Exploratory surgery, as appellee explained at trial, means that the surgeon does not know in advance what might be found, and as a result, it is impossible to predict exactly what will need to be done and to inform the patient of the risks and hazards of every procedure that might be performed. Because of this unpredictability, the consent form authorizes the physician to perform additional or different procedures.

Appellants' own expert, Dr. Bonefas, testified that the consent form authorized appellee to perform a laparoscopy, laparotomy, and other procedures not anticipated at the time of surgery. Another of appellants' experts, Dr. Frankel, testified that "a laparotomy, by definition, implies exploration; and I think it would be very difficult a priori to inform a patient of every possible thing that could be found and what could be done." Dr. Frankel also testified that, if Dr. Rubio felt that Ms. Ocomen's bowel was diseased and that resection was proper, he should go ahead and perform the resection.

Additionally, Ms. Ocomen herself testified that she was aware there were inherent risks in surgery, and that she consented to "exploratory surgery."

Dr. Reardon, appellee's general surgery expert, testified as follows:

> Q. What if Dr. Rubio is in there during the middle of the operation and he gets the patients open and sees the bowel? Should he at that point stop and wake the patient up and say, "What do you want me to do now?" Is that a reasonable, sensible option?
>
> A. I don't think that very many people who are going to have an operation would consider it reasonable to not provide them with the best care that you can provide while exercising the judgment that they have asked you to use and say, "Wake me up. Don't take care of my problem. Let me know what my problem was." The vast majority of people would agree they would want me to treat them, "Put me back to sleep and treat me." That doesn't happen.

The evidence is legally and factually sufficient to support the jury's finding that Dr. Rubio did not fail to disclose to Ms. Ocomen the risks and hazards of resection surgery that could have influenced a reasonable person in giving or withholding their consent. We overrule appellants' issues four and five.

In issue seven, appellants assert the trial court's errors harmed them. Because we find the trial court did not err, it is

unnecessary to address appellants' issue seven.

We affirm the judgment.